FILED
2022 Dec-30  PM 03:46
U.S. DISTRICT COURT
N.D. OF ALABAMA

# EXHIBIT F

FILED

2020 Dec-14  PM 04:00
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## EASTERN DIVISION

| | | |
|---|---|---|
| **DAVIS PRODUCT CREATION** | ) | |
| **AND CONSULTING, LLC d/b/a** | ) | |
| **BEESNTHINGS** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **Case No. 1:19-CV-848-CLM** |
| **v.** | ) | |
| | ) | |
| **BRIAN BLAZER, d/b/a** | ) | |
| **CARPENTER BEE** | ) | |
| **SOLUTIONS** | ) | |
| | ) | |
| **Defendant.** | ) | |

## <u>CLAIM CONSTRUCTION ORDER</u>

Plaintiff Davis Product Creation and Consulting, LLC d/b/a BeeNThings ("DPCC") and Defendant Brian Blazer d/b/a Carpenter Bee Solutions ("Blazer") make traps to catch and kill carpenter bees.

DPCC sues Blazer for patent infringement, alleging that Blazer is infringing Patent Nos. 6,766,611 ("'611 Patent"), D672,426 ("'426 Patent"), and D690,384 ("'384 Patent")(collectively, the "DPCC Patents"). *See* Doc. 1. DPCC also seeks declaratory judgment about its rights under 35 U.S.C. § 252. *See* Doc. 34. Blazer filed counterclaims that allege DPCC has infringed RE46,421 ("'421 Patent") and that the DPCC Patents are invalid. Doc 35.

The parties ask the court to construe disputed and undisputed terms of the '611

1

and '421 Patents. The court held a *Markman* hearing and construes the terms at issue below.

## I.    Factual Background

DPCC alleges that Blazer is infringing on claims of the '611 Patent with three products.: (1) the "Best Bee Trap"; (2) the "Simple Box Bee Trap"; and (3) the "Super Carpenter Bee Condo." Doc. 1 at 7. These products allegedly violate Claims 1 and 4 of the '611 Patent. Doc. 51 at 7. Claim 1 is an independent claim from which Claim 4 depends. Doc. 31-1 at col. 3.

Blazer alleges that DPCC is infringing on claims of the '421 Patent with four products: (1) the "Hanging AST Carpenter Bee Trap"; (2) the "BM Carpenter Bee Trap"; (3) the "Carpenter Bee Natural Bee Trap"; and (4) the "BeesNThings Bottom Receptacle Carpenter Bee Trap." Doc. 49 at 3. These products allegedly infringe on Claims 1 and 13, which are independent claims, and Claims 2, 4, 7, 8, 14-17, and 20 which are dependent claims of the '421 Patent. *Id.* Claims 13-17, and 20 are the reissue claims, while the rest were in the original '624 Patent. *Id.*

## II.    Applicable Law

### A.    Claim Construction

Claim construction is the process of a court determining the scope and meaning of a patent's claims. *Markman v. Westview Instruments, Inc.*, 52 F.3d 967,

979 (Fed. Cir. 1995) (en banc), *aff'd*, 517 U.S 370 (1996). It is through a patent's claims that a patentee defines the space the patentee has the right to exclude others from. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc). Claim construction is a matter of law. *Markman*, 517 U.S at 191.

Claim construction requires a court to look to the patent's intrinsic evidence— *i.e.,* the written description, figures, claims, and (to a lesser extent) the prosecution history—to determine claim meaning. *Phillips*, 415 F.3d at 1312, 1317. If the intrinsic evidence can construe a term, the court stops. *Id.* at 1312. If it is not, the court turns to extrinsic evidence like "expert and inventor testimony, dictionaries, and learned treatises." *Id.* at 1317.

Claims are to be giving their "ordinary and customary meaning" as understood by a person having ordinary skill in the art (PHOSITA). *Id.* at 1312. The effective filing date is the relevant time for construction of the PHOSITA. *Schering Corp. Amgen Inc*., 222 F.3d 1347, 1353 (Fed. Cir. 2000).

Alternatively, a patentee may act as their own lexicographer:

> Although an inventor is indeed free to define the specific terms used to describe his or her invention, this must be done with reasonable clarity, deliberateness, and precision. "Where an inventor chooses to be his own lexicographer and to give terms uncommon meanings, he must set out his uncommon definition in some manner within the patent disclosure" so as to give one of ordinary skill in the art notice of the change.

*In re Paulsen*, 30 F.3d 1475, 1480 (Fed. Cir. 1994)

Patent claims carry a presumption of validity. 35 U.SC. § 282. So courts must construe claims to preserve validity unless proven otherwise by clear and convincing evidence. *Dana Corp. v. Am. Axle & Mfg., Inc.*, 279 F.3d 1372, 1376 (Fed. Cir. 2002).

B.    Means-Plus-Function

"An element in a claim for a combination may be expressed as a means or step for performing a specified function without the recital of structure, material, or acts in support thereof…" 35 U.S.C. § 112(f). When presented with a potential § 112(f) claim, a court must first determine whether that section applies. Means-plus-function claiming only applies to "purely functional limitations that do not provide that structure that performs the recited function." *DePuy Spine, Inc. v. Medtronic Sofamor Danek, Inc.*, 469 f.3d 1005, 1023 (Fed. Cir. 2006). "If the word 'means' appears in a claim element in association with a function" then there is a rebuttable presumption that the claim is means-plus-function. *Callicrate v. Wasworth Mfg., Inc.*, 427 F.3d 1361, 1368 (Fed. Cir. 2005). But if the claim describes a structure or device that preforms the function, then the presumption is rebutted. *See Watts v. XL Sys., Inc.,* 232 F.3d 877, 880–81 (Fed. Cir. 2000); *Phillips*, 415 F.3d at 1311.

Once the term is determined to have a means-plus-function limitation,

construction begins. This is a two-step process: the court (1) determines the claimed function; and (2) identifies the corresponding structure in the written description that performs the function. *JVW Enterprises, Inc. v. Interact Accessories, Inc.*, 424 F.3d 1324, 1330 (Fed. Cir. 2005).

"Determining a claimed function and identifying structure corresponding to that function involve distinct, albeit related, steps that must occur in a particular order. In short, function must be determined before corresponding structure can be identified." *Id.* Moreover, a trial court should determine the function from the claims independently of any working embodiment. *Id.* at 1331.

After determining function, the court must determine the associated structure in the specification. In doing so, the court must account "for all structure in the specification corresponding to the claimed function." *Callicrate v. Wadsworth Mfg., Inc.*, 427 F.3d 1361, 1369 (Fed. Cir. 2005). This means that the structure should just not be limited to those found in the preferred embodiment, but structure found in any embodiment that has support in the specification. If there is no structure in the specification that corresponds to the claimed function, then the claim is invalid as indefinite, because it cannot be construed. *See e.g.*, *Function Media, LLC v. Google, Inc.*, 708 F.3d 1310, 1318 (Fed. Cir. 2013).

### III.   Construction of Claim Terms

The court finds the PHOSITA for all patents involved to be a skilled craftsman with a knowledge of carpenter bees and their characteristics. Both the '421 and '611 Patents refer to insect traps and carpenter bees under the Field of the Invention section. Doc. 31-1 at 2 ('611 Patent). Doc. 31-5 at 2 ('421 Patent).

#### A. The '611 Patent

The disputed terms in the '611 Patent appear in Claims 1 and 4.

Claim 1 reads:

A carpenter bee trap comprising a housing having a hollow interior and at least one solid wall having a hole formed therein to permit carpenter bees to enter the hollow interior of the housing, said hole having about the same size as holes normally made by carpenter bees So that the hole tends to attract such bees, said housing containing no **bait**, **the interior surface of said solid wall forming the interior edge of said hole is substantially flat**.

Claim 4 reads:

The carpenter bee trap of claim 1 in which **the interior surfaces of said housing are smooth**.

##### 1. *Bait*

DPCC proposes that "bait" means food or other lure placed in a trap scientifically proven [sic] attract carpenter bees. Doc. 51 at 9. Blazer proposes that "bait" means an attractant for bees. Doc. 55 at 5.

The word "bait" only appears in the Claims. While the parties point to Claim

1, "bait" appears in Claims 1, 7, 11, 12, and 17, and its use in those claims shows why Blazer's proposed definition of "an attractant for bees" is too broad.

Claims 1, 7, 11, 12, and 17 all say that the bee trap housing unit contains a "hole" that "attracts" or "tends to attract" bees. If Blazer is right that "bait" is any attractant for bees, then the hole is bait. But the same claims also say that the housing unit "contain[s] no bait" (Claims 1, 7, 11) or that the bee trap is a "method of trapping carpenter bees without the use of bait" (Claims 12, 17). If the housing unit cannot contain bait, and the hole attracts bees, then bait cannot mean *anything* that attracts bees. So the court must define "bait" in some way that excludes the hole.

Because the patent does not define (or even mention) "bait" outside the claims, the court must turn to extrinsic evidence. DPCC points to this definition given by Merriam-Webster: "[f]ood or other lure placed on a hook or in a trap and used for the raking of fish, birds, or other animals." Doc. 50-2 at 5. Merriam-Webster also defines bait as "something (such as food) used in luring especially to a hook or trap." *Bait*, Merriam-Webster.com, http://www.merriam-webster.com/dictionary/bait. (last visited Oct. 2, 2020).

Neither of these extrinsic definitions requires "bait" to be "scientifically proven," a limitation that DPCC asks the court to include. Nor does a plain understanding of the word "bait" require preclearance by the scientific method.

7

Generations of grandfathers have baited their grandson's fishing hook with crickets or hotdogs without first consulting scientific journals for proof of effectiveness. The same can be said of putting bait inside a trap.

But the court agrees with DPCC that "bait" must be defined as some sort of substance that can be placed in the trap based on the last sentence of the Detailed Description of the Preferred Embodiments: "If desired, an attractant for the bees may also be placed in the interior of the trap." Defining "bait" as some type of substance that can be physically placed in the bee trap not only comports with this description, it excludes the "hole" as required by the Claims.

So the court construes "bait" to mean **a substance that attracts bees**.

    2.  *The interior surface of said solid wall forming the interior edge of said hole is substantially flat*

DPCC proposes that "the interior surface of said solid wall forming the interior edge of said hole is substantially flat" means "the interior surface of the wall is a planar surface." Doc. 51 at 10. Blazer proposes that this term means "the interior surface of the wall through which the hole is formed is smooth and even, without lumps or indentations." Doc. 55 at 8. The parties, through their claim construction briefs, then arrived at a compromise with the construction, "the interior surface of the wall through which the hole is formed is even and level."

The starting point for every term in claim construction is plain and ordinary

meaning. *Phillips*, 415 F.3d at 1312-13. The court should not seek to act as a thesaurus when the PHOSITA can understand the claim. *See Thorner v. Sony Computer Entm't Am. LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012). The court does not have a duty to construe every claim or limitation. *U.S. Surgical Corp. v. Ethicon, Inc.*, 103 F.3d 1554, 1568 (Fed. Cir. 1997) ("[claim construction] is not obligatory exercise in redundancy.") This court is confident that the jury can determine this term's meaning—which boils down to interpreting the phrase "substantially flat"—through **plain and ordinary meaning**.

> 3.   *The interior surfaces of said housing are smooth*

DPCC proposes that "the interior surfaces of said housing are smooth" means the interior surface of the housing is substantially free from irregularities. Doc. 51 at 11. Blazer proposes that this term means "the interior surfaces of the housing are even and regular and are free from perceptible projections, lumps or indentations." Doc. 55 at 9.

For the reasons noted above, the court determines that **plain and ordinary meaning** applies. The court needn't act as a thesaurus for the word "smooth."

## B. The '421 Patent

The agreed and disputed terms appear in independent Claims 1 and 13. The rest of the claims are dependent claims that derive meaning from Claims 1 and 13.

<u>Claim 1</u> reads:

A carpenter bee trap comprising:

a trap entrance unit forming a plenum being made of **wood or a wood substitute**;
said trap entrance unit having at least one hole drilled there-through and sized to mimic a natural carpenter bee nest tunnel so as to provide a **primary attractant**;
said hole extending from the outside of the trap unit to a plenum interior, said hole being configured to extend substantially horizontally or at an upward angle; **a means to shelter an entrance to said hole is provided to reduce the admittance of ambient light**;


said trap unit further comprising **a receptacle adapter** being substantially located at the bottom of said trap unit and **being configured to receive** a clear or translucent receptacle;
a receptacle received by said adapter
   situated to allow **ambient light** to enter through said bottom into said plenum interior, thereby providing a **secondary attractant**; said receptacle further being provided to receive trapped bees.

<u>Claim 13</u> reads:

A carpenter bee trap, comprising:

a trap entrance unit formed of **wood or a wood substitute**, wherein at least one side of the trap entrance unit has at least one entrance hole that extends from outside the trap entrance unit to an interior of the trap entrance unit, wherein the at least one entrance hole extends substantially horizontally or at an upward angle with a size and shape configured to provide a **primary attractant** for carpenter bees, and wherein the trap entrance unit further comprises an exit opening for providing an exit path from the interior of the trap entrance unit; and **a receptacle adapter located at the exit opening of the trap entrance unit**, wherein the **receptacle adapter** is **adapted to receive** at least one receptacle and is adapted so as to allow at least some **ambient light** to

10

enter the interior of the trap entrance unit via the exit opening, thereby providing a **secondary attractant** for carpenter bees.

The parties agree on a construction for two claim terms: "wood or wood substitute" and "ambient light." Doc. 40, Ex. A. For "wood or wood substitute," the parties have adopted the meaning to be **natural or synthetic wood**. *Id.* For "ambient light," the parties have adopted the meaning to be **the light surrounding the trap**. *Id.* The court agrees with the parties and holds these terms to be construed as such. So the court turns to the disputed terms.

> 1. *a means to shelter an entrance to said hole is provided to reduce the admittance of ambient light*

This limitation includes the word "means," which creates a rebuttable presumption that this is a means-plus-function claim. *See Callicrate*, 427 F.3d at 1368. The parties agree that this is a means-plus-function claim. Doc. 49. The court also agrees (with the caveat given on pages 14-17), so it turns to the two-step process of construing a means-plus-function claim: (1) identify the function, then (2) identify the corresponding structure, material or act.

<u>Parties' positions</u>: DPCC proposes the function is to shelter an entrance to a hole from presumably light or rain and contends that the overhanging roof (reference numbers 161 and 261) is the only structure disclosed in the specification that provides this function. Doc 49 at 5. Blazer proposes the function is to shelter an

11

entrance to said hole and points to number references 161 and 261 (overhangs) and 11, 21, 31, and 511 (holes) as the corresponding structures. *Id*. at 5-6.

<u>Function</u>: The text plainly reveals the function—*i.e., to* shelter the entrance to the hole drilled into the trap entrance unit from ambient light.

<u>Structure</u>: Identifying the associated structure is not so easy. The parties agree that the overhanging roof, number reference 161 of Figures 1A-1B and number reference 261 of Figures 2A-2B, is a structure that performs this function. Doc. 49 at 5; Doc. 54 at 4. The parties disagree about the entrance holes. Blazer contends that the holes (number references 11, 21, 31, and 511) are additional structures that perform the function; DPCC contends that the holes cannot perform the function. *Id*. The court agrees with DPCC.

Again, Claim 1 says that the trap is comprised of a "means to shelter an entrance to said hole," and that shelter is included "to reduce the admittance of ambient light[.]" While Blazer is right that the upward angle of the entrance holes can reduce the admittance of ambient light, the holes cannot perform the stated function of sheltering their own entrance—any more than a room or a cave can shelter its own entrance. Figure 1A demonstrates the point:



Overhang (161)

Hole (11)

"Entrance to Said Hole"

While it is true that the upward slope of the hole (11) may reduce the amount of light that ultimately reaches the interior of the trap, it does not "shelter [the] entrance" of the hole. And according to the claim's plain text, the entrance is the only place that matters. So the court agrees with DPCC that number references 161 and 261, but not 11, 21, 31, and 511, are structures that perform the stated function.

§112(f): The Eastern District of Kentucky construed this claim differently. It found that "means to shelter an entrance to said hole" also includes "bores made at an angle between 5 and 90 degrees from horizontal and equivalents." Doc. 49-1 at 27.[1] The court has already explained why it cannot similarly read the patent to make holes be structures that cover themselves.

But another problem exists, one the Kentucky court did not address: reading

---

[1] Blazer says the specification "uses the terms 'hole' and 'bore' interchangeably" (doc. 65 at 8). The court agrees.

the holes to be structures could eliminate Claim 1 as a means-plus-function claim. 35 U.S.C. §112(f) states: "An element in a claim for a combination may be expressed as a means or step for performing a specified function ***without the recital of structure***, material, or acts in support thereof..." (emphasis added). As the Federal Circuit puts it, "even if the claim element specifies a function, if it also recites sufficient structure or material for performing that function, §112 ¶6 [now §112(f)] does not apply." *Rodime PLC v. Seagate Tech., Inc.*, 174 F.3d 1294, 1302 (Fed. Cir. 1999).

The element at issue mentions the hole three times:

> *said hole* extending from the outside of the trap unit to a plenum interior, *said hole* being configured to extend substantially horizontally or at an upward angle; a means to shelter an entrance to *said hole* is provided to reduce the admittance of ambient light;

If Blazer is right that the hole recited in the element is structure that performs the function of "shelter[ing] an entrance to said hole," then by its plain terms, §112(f) would not apply. *Id.* The E.D. Ky. decision did not deal with this §112(f) question, so the court ordered the parties to file supplemental briefs about §112(f). *See* Doc. 64 (order). In its supplemental brief (doc. 65), Blazer says §112(f) is not a problem for two reasons.

First, Blazer points to §2181(I)(C) of the Manual of Patent Examining Procedure, which dictates that "the term 'means' or 'step' or the generic placeholder

must not be modified by sufficient structure, material, or acts for achieving the specified function." Doc. 65 at 1. According to Blazer, if the word "means" is used, the means-plus-function presumption is rebutted only if the structure modifies the word "means"—for example, "perforation means" and "spring means." If the structure is recited elsewhere in the element, the presumption survives. The problem, though, is that this is not what §112(f) says. Section 112(f) does not forbid use of the structure as a prefix to the word "means." Section 112(f) says not to recite supporting structure, period. *See Rodime*, 174 F.3d at 1302. ("[E]ven if the claim element specifies a function, if it also recites sufficient structure or material for performing that function, [§112(f)] does not apply.").

Second, Blazer argues that §112(f) applies only to individual limitations within an element and that the word "means" starts the limitation within the element. Doc. 65 at 6. Put another way, Blazer argues that the relevant element is three distinct elements and §112(f) applies only to the last one:

> said hole extending from the outside of the trap unit to a plenum interior, said hole being configured to extend substantially horizontally or at an upward angle; ***a means to shelter an entrance to said hole is provided to reduce the admittance of ambient light***;

But elements aren't structured that way. "Where a claim sets forth a plurality of elements or steps, each element or step of the claim should be separated by a line

indentation." 37 C.F.R. § 1.75(i); Manual of Patent Examining Procedure, 9th ed., rev. 10.2019 (Jun. 2020). This means that everything in the quote above (column 7 line 47 to line 51) is the same element. So the court must review the entire element when determining whether §112(f) applies. And §112(f) says that "an element in a claim" can cite a means if there is no "recital of structure."

To be clear, the court's finding that the holes are not structures does not hinge on its discussion of §112(f). The court's primary rationale can be summed up thusly: saying that "said hole" is "a means to shelter an entrance to said hole [from] ambient light" is just as nonsensical as saying that "my hair" is "a means to shelter my hair from the rain." The latter phrase plainly envisions something other than my hair to shield my hair—like a hat or an umbrella. The former phrase similarly envisions some structure other than the hole to cover the entrance to the hole. Section 112(f) only becomes a problem if Blazer is right that a hole can shelter its own entrance.

\* \* \*

The Kentucky district court may be right that excluding holes as structures is a "tortured construction" of the patent. Doc. 49-1. But Blazer, not this court, inflicted the torture. It was Blazer's burden to draft the patent concisely. *See Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 901 (2014). The court is not free to edit the patent to ease the construction.

2. *a receptacle adapter*

DPCC proposes that a "receptacle adapter" means "a device which is part of the trap entrance unit which receives the receptacle and mechanically attaches to the receptacle to the trap." Doc. 40 at 6. Blazer proposes that this term means "a connector for joining a receptacle to the trap." *Id.* Claims 1, 13, 14, and 20 are the relevant claims that receptacle adapter appears in. Doc. 31-5, cols. 7-8. This construction can be divided into two questions: (1) is the receptacle adapter part of the trap entrance unit; and (2) does it mechanically attach the receptacle to the trap?

Is the Receptacle Adapter Part of the Trap Unit? The answer depends on which claim you are reading. Claim 1 says that the receptacle adapter "comprise[s]" part of the trap entrance unit. But Claim 13 treats the receptacle adapter as a distinct element of the bee trap, separate from the trap entrance unit. Because of this ambiguity, the court must turn to the specification. *See Phillips*, 415 F.3d at 1312.

Blazer contends that defining the receptacle adapter to be part of the trap entrance unit will exclude the preferred embodiments of Figures 1A-1B and 2A-2C. Doc. 49 at 11. But the opposite is true.

The written description in describing Figure 1A-1B states, "[a]t the bottom of trap entrance unit 1 is reducer section [4] 15 made of clear plastic with adapter coupling [5] 14 at the bottom which accepts a clear plastic removable receptacle [6]

17

18." Doc. 31-5, col. 5, lines 2-5.



The term "adapter coupling" is used synonymously with both "receptacle adapter

coupling" and "receptacle adapter" throughout column 5 of the '421 Patent in citing

"[5] 14." The use of the verb "is," which is the present tense first-person singular of

"be," denotes that the proceeding words belong to the class of noun (trap entrance

unit) before the verb. *See Be*, Merriam-Webster.com, https://www.merriam-

webster.com/dictionary/be. (last visited Sep. 27, 2020). An illustration—at the front

of the plane is the cockpit, so the cockpit is part of the front of the plane.

The quoted language in Blazer's Opening Brief supports this construction.

Doc. 49 at 10. "In production the reducer 4 and receptacle adapter 5 [sic] may be

specially molded as one part with molded features such as tabs or inserts *for

attachment to the bottom of the **upper trap unit 1***" (emphasis added to the emphasis).

*Id.* This is attaching the receptacle adapter to the upper trap unit, not the whole trap

unit. Logic would dictate that right below the upper trap unit is the lower trap unit.

Figures 1A-1B and 2A-2C support the Court's construction as stated above, so the Court will briefly turn to the remaining drawings. Figures 3A-3D, 4A-4B, and 5A-5C all must have a receptacle adapter to be covered by the claims (Figure 6 seems to correspond with abandoned claims).



In Figure 4A above, there is not a separate device that could represent the receptacle adapter. If the receptacle adapter is not a part of the trap entrance unit, then none of these figures would be covered by the claims.

Claim 1's language furthers the construction that the receptacle adapter is part of the trap unit. The claim states that "said trap [entrance] unit further comprising a receptacle adapter." Doc. 31-5, col. 7, line 52. "Comprising" is an open phrase and allows coverage of technologies that employ additional, unrecited elements while

enumerating that contained elements. *AFG Indus., v. Cardinal IG Co.*, 239 F.3d 1239, 1245 (Fed. Cir. 2001). This means that "receptacle adapter" is an element of the trap entrance unit.

Admittedly, Claim 13 and its dependents do not follow the Court's interpretation. In Claim 13, the "receptacle adapter" is treated as a distinct element of the carpenter bee trap, rather than part of the trap entrance unit. Doc. 31-5, col. 8, lines 24-41. Still, an overwhelming amount of evidence points the other way. On one side we have Claim 13 and its dependents, on the other, the drawings, the written description, and Claim 1 and its dependents. While the Court wishes that the '421 Patent was more consistent, the specification only supports Claim 1's version of the receptacle adapter being part of the trap entrance unit.

Is "mechanical attachment" required? Blazer contends that the phrase would construe the patent to preclude the "friction fit" preferred embodiments of Figures 3A-3D and 4A-4B. Doc. 49 at 12. The friction fit would lend itself to use the wedge, one of the six simple machines to provide **mechanical** advantage, so the Court does not think Blazer's argument is valid. However, the principle of claim differentiation applies here.

Claim differentiation provides that "each claim in a patent is presumptively different in scope." *RF Del., Inc. v. Pac. Key-stone Techs., Inc.*, F.3f 1255, 1263

(Fed. Cir. 2003). Claim 2 (dependent on Claim 1) claims a carpenter bee trap where "the receptacle is temporarily attached to the trap." Doc. 31-5, col. 7, lines 61-62. Claim 1 does not have such a limitation. If the receptacle is permanently attached in Claim 1, then it cannot be mechanically attached. So mechanically attaches is not an appropriate part of the construction of "receptacle adapter."

The court holds the proper construction of receptacle adapter to be **a device that is part of the trap entrance unit that receives the receptacle and attaches the receptacle to the trap**.

The court knows that DPCC did not make all of these points. But the court retains "an independent obligation to determine the meaning of the claims." *Exxon Chem. Patents, Inc. v. Lubrizol Corp.*, 64 F.3d 1553, 1555 (Fed. Cir. 1995).

3. *primary attractant*

DPCC proposes that "primary attractant" means "the first trait of the trap that attracts a carpenter bee." Doc. 40 at 5. Blazer proposes that this term needs no construction. *Id.*

Upon initial review of the written description and claims, the court notes inconsistencies in the patent. "Primary attractant" only appears once in written description: "Live bees in the trap actively make distressed buzzing noises which appear to be the primary attractant." Doc. 31-5, col. 7, lines 10-11. In this sense, the

primary attractant is the thing that first draws the bees to the trap. Claim 1 conflicts with this interpretation: "a natural carpenter bee nest tunnel as to provide a primary attractant." *Id.* lines 45-46. Given this, the Court agrees with DPCC's construction with slight modification: "Primary attractant" means **a trait that attracts bees into the trap entrance unit.**

4. *configured to receive*

DPCC proposes that "configured to receive" means the receptacle adapter accepts the receptacle to positively retain the receptacle or allow the receptacle's removal. Doc. 40 at 7. Blazer contends no construction is necessary and that plain and ordinary meaning should rule. *Id*.

The court notes that this term also appears in asserted Claim 20, which depends on Claim 13. Doc. 31-5, col. 8, line 66. Neither party mentions this in their claim construction brief. So "configured to receive" actually appears three times in the '421 Patent—once each in Claims 1, 12, and 20. Blazer's argument in his reply brief nails the construction:

> …DPCC's proposed construction includes the phrase "to positively retain the receptacle or allow for the receptacle's removal." Does this mean that it cannot both retain the receptacle and allow for its removal? Claim 2, which depends from claim[sic] 1, calls for the receptacle to be "temporarily attached to the trap." Thus, under the doctrine of claim differentiation, claim 1 must necessarily cover a receptacle that is not "temporarily attached to the trap."

22

Blazer is right, and the court holds that "configured to receive" requires no construction, **plain and ordinary meaning applies**.

>   5.  *secondary attractant*

DPCC proposes that "secondary attractant" means "the second trait of the trap that attracts a carpenter bee." Doc. 49 at 16. Blazer contends that no construction is necessary and that plain and ordinary meaning. *Id.*

The court's job is harder here because, as DPCC points out, "secondary attractant" does not appear in the specification at all. Doc. 54 at 9. Claim 1 and 13 both use "secondary attractant" when claiming the receptacle element of the bee trap. Logic would lead that the "attractant" described here is to bring the bees into the receptacle. Because the only way into the receptacle is the bottom of the entrance trap unit, the bees must be able to sense the attractant while in the trap entrance unit.

The specification supports this reading (Doc. 31-5, col. 5, line 24-29)

> When bees enter trap entrance unit 1, they immediately see the ambient light entering from the clear plastic reducer 4 as well as from receptacle 6 through the opening in adapter coupling 5. Attracted by the light, the bees immediately fly to the bottom of the trap where they are quickly funneled into the receptacle 6.

In light of this, the court construes "secondary attractant" to mean **a trait that draws bees from the interior of the entrance trap unit into the receptacle**. Again, the court has an independent duty to construe claims. *Exxon.*, 64 F.3d at 1555.

### 6. *a receptacle adapter located at the exit opening of the trap unit*

DPCC proposes that a "receptacle adapter located at the exit opening of the trap unit" means "a device that is distinct from the trap entrance unit which receives the receptacle and mechanically attaches the receptacle to the trap and is located proximate the exit opening of the trap entrance unit." Doc. 40 at 9. Blazer proposes this term means "a connector for joining a receptacle to the trap." *Id*.

The court points the parties to the discussion about "receptacle adapter" in Section 2 above. This discussion takes care of all points made by both parties. The court holds that **plain and ordinary meaning** can be used to determine what "receptacle adapter located at the exit opening of the trap unit" means as "receptacle adapter" has already been construed.

### 7. *adapted to receive*

DPCC proposes that "adapted to receive" means "the receptacle adapter accepts the receptacle to positively retain the receptacle or allow the receptacle's removal." Doc. 49 at 17. Blazer contend that no construction is necessary and that plain and ordinary meaning. *Id*.

The court holds that "adapted to receive" is synonymous with "configured to receive." Thus, **plain and ordinary meaning applies**.

\*   \*   \*   \*   \*

In accordance with the *Markman* hearing entered herewith, the court **ADOPTS** the preceding claim constructions.

**DONE** and **ORDERED** this 14th day of December, 2020.

_____
**COREY L. MAZE**
UNITED STATES DISTRICT JUDGE