UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
EASTERN DIVISION

**BEE WAREHOUSE, LLC,** *et al.***,**
    Plaintiffs,

v.

**BRIAN BLAZER,**
    Defendant.

Case No. 1:22-cv-1623-CLM

## ORDER

    Brian Blazer patented a carpenter bee trap. This case started when Blazer told Amazon.com that Bee Warehouse LLC was selling a bee trap designed by Davis Product Creation and Consulting ("DPCC") that infringed his patent. So Bee Warehouse and DPCC sued Blazer. (Doc. 1). From here on, the court calls the Plaintiffs "Bee Warehouse" for short.

    Bee Warehouse asks the court to enter a preliminary injunction that (1) prohibits Blazer from claiming that its bee trap infringes his patent, and (2) orders Blazer to retract any past claims of infringement. (*See* Doc. 3). As the court explains, Bee Warehouse has met its burden of proving the four typical preliminary injunction factors: (1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable injury; (3) that the injury to Bee Warehouse outweighs the potential harm to Blazer; and (4) that an injunction would not disserve the public interest.

    But this case is atypical; Bee Warehouse asks the court to restrict and compel speech, which raises First Amendment issues. That means the court must make another finding before it can enter a preliminary injunction—*i.e.*, that Blazer acted in bad faith when he filed his notice of infringement with Amazon. While the court may disagree with Blazer's interpretation of his patent, the court finds that Blazer's notice to Amazon was not objectively baseless, and therefore, not made in bad faith. So the court **DENIES** Bee Warehouse's motion for a preliminary injunction.

## BACKGROUND

Blazer makes and sells carpenter bee traps and owns U.S. Patent Reissue No. 46,421 ("'421 Patent"). Bee Warehouse also sells carpenter bee traps, sometimes designed by DPCC. This is not the first time these parties have been embroiled in lawsuits over Blazer's patents. Blazer has sued others as well.

One of those lawsuits led Amazon to agree to allow Blazer, or someone acting on his behalf, to report and remove allegedly infringing items from Amazon. (Doc. 1, pp. 8–9). Bee Warehouse complains that this process allows Blazer to remove items without substantial oversight. (*Id.*).

And it says, that's what happened here. Blazer sent a notice to Amazon that, in his opinion, Bee Warehouse was selling a trap that infringed Blazer's '421 Patent. Based on Blazer's notice, Amazon removed Bee Warehouse's trap from its site.

So Bee Warehouse sued Blazer for declaratory and injunctive relief regarding the non-infringement of the '421 Patent. (*See* Doc. 1). According to the Complaint, DPCC designed a new carpenter bee trap based in part on Blazer's allegations of infringement in one of his other lawsuits. Bee Warehouse and others sell this new design, which the parties call the "Bee Warehouse Trap," in stores and on Amazon. (Doc. 1, pp. 4–5). At least they did, until Blazer told Amazon to pull the trap.

Bee Warehouse alleges that Blazer failed to reasonably investigate whether the Bee Warehouse Trap actually infringed the '421 Patent. (*Id.*). In other words, Bee Warehouse says that Blazer submitted a frivolous and bad-faith notice of infringement (*id.*), which again, Bee Warehouse says results from Amazon's deal with Blazer.

Bee Warehouse asserts that Blazer's actions (1) prevent DPCC from selling any item on Amazon, removing DPCC from a significant marketplace; (2) prevent DPCC from selling a non-infringing bee trap; and (3) are anti-competitive and amount to patent misuse. In his Answer to the complaint, Blazer asserted a counterclaim for willful infringement of Blazer's rights under the '421 Patent. (*See* Doc. 4).

2

Bee Warehouse asked this court to enter a preliminary injunction prohibiting Blazer from claiming that the Bee Warehouse Trap infringes the '421 Patent, and ordering Blazer to retract any past claims of infringement. (Doc. 3). The court held a hearing on April 17, 2023, during which it viewed the trap at issue and heard testimony from Blazer.

## LEGAL STANDARD

"To receive a preliminary injunction, the plaintiff must clearly establish the following requirements: '(1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable injury; (3) that the threatened injury to the plaintiff outweighs the potential harm to the defendant; and (4) that the injunction will not disserve the public interest.'" *Keister v. Bell*, 879 F.3d 1282, 1287 (11th Cir. 2018) (quoting *Palmer v. Braun*, 287 F.3d 1325, 1329 (11th Cir. 2002)); *accord ACLU of Fla., Inc. v. Miami-Dade Cnty. Sch. Bd.*, 557 F.3d 1177, 1198 (11th Cir. 2009). Since a "preliminary injunction is an extraordinary and drastic remedy," courts are not to grant it "unless the movant clearly establishes the burden of persuasion as to the four requisites." *All Care Nursing Serv., Inc. v. Bethesda Mem'l Hosp., Inc.*, 887 F.2d 1535, 1537 (11th Cir. 1989) (quotation omitted). Accordingly, "[f]ailure to show any of the four factors is fatal." *ACLU of Fla., Inc.*, 557 F.3d at 1198. On top of these factors, "federal law requires a showing of bad faith" before a patentee can be enjoined from communicating his patent rights. *Myco Indus., Inc. v. BlephEx, LLC*, 955 F.3d 1, 10 (Fed. Cir. 2020) (quoting *GP Indus., Inc. v. Eran Indus., Inc.*, 500 F.3d 1369, 1373 (Fed. Cir. 2007)).

Preliminary injunctions are designed to "preserve the relative positions of the parties until a trial on the merits can be held." *Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981). "Given this limited purpose, and given the haste that is often necessary if those positions are to be preserved, a preliminary injunction is customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits." *Id.* A party is thus not required to prove his case in full at a preliminary-injunction hearing, and the findings of fact and conclusions of law made by a court granting a preliminary injunction are not binding at trial on the merits. *Id.* (citations omitted).

## DISCUSSION

### A. Preliminary Injunction Factors

To receive a preliminary injunction, the plaintiff must clearly establish four requirements: "'(1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable injury; (3) that the threatened injury to the plaintiff outweighs the potential harm to the defendant; and (4) that the injunction will not disserve the public interest.'" *Keister*, 879 F.3d at 1287 (quoting *Palmer*, 287 F.3d at 1329). The court will address each factor in turn.

### 1. Substantial Likelihood of Success on the Merits

The first issue is whether Bee Warehouse has shown a substantial likelihood of success on the merits. *Keister*, 879 F.3d at 1287 (citation omitted). "A substantial likelihood of success on the merits requires a showing of only *likely* or probable, rather than *certain*, success." *Gonzales v. Governor of Ga.*, 978 F.3d 1266, 1270–71 n.12 (11th Cir. 2020) (citing *Schiavo ex rel. Schlindler v. Schiavo*, 403 F.3d 1223, 1232 (11th Cir. 2005)).

When the underlying claim is patent infringement, courts apply a two-step analysis to determine whether infringement has occurred. *See PC Connector Sols., LLC v. SmartDisk Corp.*, 406 F.3d 1359, 1362 (Fed. Cir. 2005); *see also Oakley, Inc. v. Sunglass Hut Int'l*, 316 F.3d 1331, 1339 (Fed. Cir. 2003) ("An assessment of the likelihood of infringement, like a determination of patent infringement at a later stage in litigation, requires a two-step analysis."). In step one, the court determines the scope and meaning of the patent claims asserted. *Oakley, Inc.*, 316 F.3d at 1339 (citation omitted). This step is often called "claim construction," and is a question of law. *Id.* (citing *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 970–71 (Fed. Cir. 1995) (en banc). In step two, the properly construed claims are compared to the allegedly infringing device. *Id.* (citation omitted). Step two requires a determination that every claim limitation or its equivalent be found in the accused device. *Id.* (citing *Warner-Jenkinson Co. v. Hilton Davis Chem. Co.*, 520 U.S. 17, 29 (1997)). Those determinations are questions of fact. *Id.* (citation omitted).

4

> ### a. Step 1: Claim Construction

Again, "[t]he first step in most infringement suits is the procedure called 'claim construction,' where the scope of the claim is defined by the court." *Abbott Lab'ys v. Sandoz, Inc.*, 544 F.3d 1341, 1358 (Fed. Cir. 2008).

The '421 Patent contains two independent claims: Claim 1 and Claim 13.[1] Blazer's allegation of infringement is limited to independent Claims 13, and its dependent claims 14-17, and 21. (See Doc. 15, pp. 6–7). If an accused product does not infringe an independent claim—here, Claim 13—it also does not infringe any dependent claims. *Wahpeton Canvas Co. v. Frontier, Inc.*, 870 F.2d 1546, 1553 (Fed. Cir. 1989).

Claim 13 reads:

> 13. A carpenter bee trap, comprising:
>
> a trap entrance unit formed of wood or a wood substitute, wherein at least one side of the trap entrance unit has at least one entrance hole that extends from outside the trap entrance unit to an interior of the trap entrance unit, wherein the at least one entrance hole extends substantially horizontally or at an upward angle with a size and shape configured to provide a primary attractant for carpenter bees, and wherein the trap entrance unit further comprises an exit opening for providing an exit path from the interior of the trap entrance unit; and

---

[1] A "patent claim" is the "'portion of the patent document that defines the scope of the patentee's rights.'" *Teva Pharms USA, Inc. v. Sandoz, Inc.*, 574 U.S. 318, 321 (2015) (quoting *Markman*, 517 U.S. at 372). There are two general types of patent claims: (1) independent claims, and (2) dependent claims. An "independent claim" is a stand-alone claim that contains all the limitations necessary to define an invention. A "dependent claim" refers to a previous claim and must add another limitation to the previous claim. A claim in dependent form incorporates by reference all the limitations of the claim to which it refers.

> a receptacle adapter located at the exit opening of the trap entrance unit, wherein the receptacle adapter is adapted to receive at least one receptacle and is adapted so as to allow at least some ambient light to enter the interior of the trap entrance unit via the exit opening, thereby providing a secondary attractant for carpenter bees.

U.S. Patent Reissue No. 46,421 (issued June 6, 2017).

Claim construction is a question of law, and ordinarily, this court would need to resolve it. Thankfully, though, the Federal Circuit has already construed Claim 13, *see Blazer v. Best Bee Bros., LLC, et al.*, No. 22-1033, 2022 WL 16954848, slip op. at 11 (Fed. Cir. Nov. 16, 2022), and that decision is binding on this court.

At the hearing, the parties agreed that under Federal Circuit's construction, a "receptacle adapter" must include: (1) a structure; (2) located at the exit opening of the trap entrance unit; (3) configured to receive at least one receptacle; (4) configured to help retain a receptacle; and (5) that allows at least some ambient light to enter the interior of the trap entrance unit via the exit opening. (Doc. 24, pp. 13–14). The court carries this construction of "receptacle adapter" on to step two.

### b. *Step 2: Comparison*

Step two requires the trier of fact to "compar[e] the properly construed claims to the device accused of infringing." *Markman*, 52 F.3d at 976. Ultimately, this step requires a determination of whether the properly construed claims cover the accused device, either literally or under the doctrine of equivalents. *See PC Connector Sols. LLC v. SmartDisk Corp.*, 406 F.3d 1358, 1364–65 (Fed. Cir. 2005).

Because it is a question of fact, step two ordinarily should be decided by a jury. *See CommScope Techs. LLC v. Dali Wireless Inc.*, 10 F.4th 1289, 1295 (Fed. Cir. 2021); *i4i Ltd. P'ship v. Microsoft Corp.*, 598 F.3d 831, 849 (Fed. Cir. 2010). That said, summary judgment is proper when no genuine issues of material fact are in dispute. *PC Connector*, 406 F.3d at 1364

(citation omitted). In other words, the court can decide the infringement issue for itself if "no reasonable jury could find . . . each and every limitation recited in the properly construed claims in the accused device." *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004) (citations omitted).

A product can infringe in two ways: (1) literal infringement, or (2) infringement under the doctrine of equivalents. *PC Connector*, 406 F.3d at 1364. "Literal infringement requires that the accused device embody every element of the claim." *Id.* (quoting *Builders Concrete, Inc. v. Bremerton Concrete Prods. Co.*, 757 F.2d 255, 257 (Fed. Cir. 1985)). And where literal infringement is not present, infringement under the doctrine of equivalents may be found where the "accused product of process contain[s] elements identical or equivalent to each claimed element of the patented invention." *Warner-Jenkinson Co.*, 520 U.S. at 40.

### i.  *Literal Infringement*

The court first analyzes whether the Bee Warehouse Trap literally infringes the '421 Patent. "Literal infringement of a claim exists when every limitation recited in the claim is found in the accused device, i.e., when the properly construed claim reads on the accused device exactly." *Cole v. Kimberly-Clark Corp.*, 102 F.3d 524, 532 (Fed. Cir. 1996) (citation omitted). The word "limitation" in the context of patent infringement is synonymous with "element."

Again, the parties agree that, under Federal Circuit's construction, a "receptacle adapter" must include these elements: (1) a structure; (2) located at the exit opening of the trap entrance unit; (3) configured to receive at least one receptacle; (4) configured to help retain a receptacle; and (5) that allows at least some ambient light to enter the interior of the trap entrance unit via the exit opening. (Doc. 24, pp. 13–14).

Blazer asserts that the Bee Warehouse Trap contains several structures that qualify as a receptacle adapter.

*Alleged Receptacle Adapter #1: Bottom of Trap Entrance Unit + Lip*

First, Blazer says the bottom corner of the trap entrance unit, together with the plastic lip around the top of receptacle, serves as a form-fitting receptacle adapter.




The primary problem with this argument is that spot where the receptacle's plastic lip form fits to the wooden edge of the entrance unit (red circle) is not "located at the exit opening of the trap entrance unit" (blue arrow) as required by Claim 13 and the Federal Circuit. It's as far from the bottom opening as possible. That reason alone makes it substantially likely that Bee Warehouse could prove non-infringement.

But there's more. It's not clear that the alleged receptacle adapter is configured to "receive" a receptacle. Blazer asks this court to consider what it means to "receive" something. He argues that the bottom of the wooden trap entrance unit "receives" the plastic receptacle just like your head "receives" a baseball cap. According to Blazer, just as a person's head can receive a baseball cap, the baseball cap can also receive the head. Thus, "receives" is not a one-way proposition. In Blazer's view, the bottom

of the wooden trap entrance unit "receives" the translucent plastic receptacle with assistance from the plastic lip that juts out from the top edge of the receptacle.

The court accepts that a person's head can receive a baseball cap, and the baseball cap can also receive the head. But a head cannot receive a head, and a baseball cap cannot receive a baseball cap. In other words, a thing cannot receive itself. And Claim 13, as construed by the Federal Circuit, requires the adapter to receive the receptacle.

Again, Blazer says the combination of the bottom edge of the trap entrance unit and the plastic lip around the receptacle, serve as a receptacle adapter. If that's true, then the receptacle *is* the receptacle adapter—meaning that the receptable "receives" itself. That defies the ordinary understanding of the word "receive," and the court finds that there is a substantial likelihood that a jury would reject it.

There's yet a third problem: It's not clear that the alleged receptacle adapter allows at least some ambient light to enter the interior of the trap entrance unit via the exit opening, as required by Claim 13 and the Federal Circuit. Once the plastic lip of the receptacle form fits to the bottom of the wooden trap entrance unit, no light can pass through this area. There's a substantial likelihood that a jury could find this reason to find non-infringement.

For all of these reasons, independently and collectively, the court finds that there is a substantial likelihood that a jury would find that the joining of the bottom edge of the trap entrance unit with the plastic lip around the receptacle is not a receptacle adapter in Claim 13 as construed by the Federal Circuit.

*Alleged Receptacle Adapter #2: Philips-head Screws*

Blazer also argues that the Philips-head screws that run through the receptacle into the bottom of the entrance unit serve as a receptacle adapter. He argues that the screws are structures configured to receive the receptacle, and the screws help retain the receptacle.

9



But again, the problem for Blazer is that the screws (red circle) are not located at the exit opening of the trap entrance unit (blue arrow). And even if they were, the screws do not allow at least some ambient light to enter the interior of the trap entrance unit via the exit opening. Screws do not allow *any* light to pass through them.

While the court agrees that the screws "help retain" a receptacle, the screws do not "receive" a receptacle. Instead, the screws go through the receptacle, and into the main trap entrance unit.

Accordingly, the court finds that there is a substantial likelihood that a jury would find that the Philips-head screws are not a receptacle adapter in Claim 13, as defined by the Federal Circuit.

*Alleged Receptacle Adapter #3: All of the Above*

For the first time at the court's hearing, Blazer advanced a new theory that the combination of (1) the bottom of the trap entrance unit, (2) the clear plastic lip around the receptable, and (3) the screws which secure

the receptacle to the trap entrance unit constitute a receptacle adapter. But this theory fails because the combination of these three items still is not located at the exit opening of the trap, and still is not adapted to allow ambient light to enter the trap entrance unit via the exit opening.

On the claim chart he sent to Amazon, Blazer explained that the "receptacle" admitted ambient light. (*See* Doc. 31-1, p. 8). But to prevail on the merits here, Blazer needs to prove that the receptacle adapter—not the receptacle itself—admits ambient light into the exit opening. And that he cannot do.

—

Having reviewed the parties' filings, and having held and inspected a physical copy of the Bee Warehouse Trap, the court finds that the Bee Warehouse Trap does not have a receptacle adapter that performs all of the receptacle adapter functions of Claim 13. Thus, the court finds that there is a substantial likelihood that a jury would find that the Bee Warehouse Trap does not literally infringe the '421 Patent.

The "Summary of the Invention" in the '421 Patent—drafted by Blazer—reinforces the court's findings. The summary states in part:

> The interior of the trap entrance unit forms a plenum which promotes the conveyance of the bees *through at least once receptacle adapter* and into at least one removable receptacle.

(Doc. 1-1, p. 14) (emphasis added).

When describing the '421 Patent, the Federal Circuit relied on this language and stated twice in its opinion that bees must pass through the receptacle adapter and into the receptacle. *See Blazer v. Best Bee Brothers LLC*, No. 22-1033, 2022 WL 16954848, slip op at 3 (Fed. Cir. Nov. 16, 2022). In other words, the receptacle adapter described in Claim 13 allows bees to pass *through* it.

But none of the features of the Bee Warehouse Trap that Blazer calls the receptacle adapters allow bees to pass through it. Bees cannot travel through the form-fitted edge of trap entrance unit and receptacle,

11

nor can bees travel through screws. Thus, the "Summary of the Invention" supports this court's finding that the Bee Warehouse Trap does not literally infringe the '421 Patent.

### ii. Doctrine of Equivalents

The court next turns to whether the Bee Warehouse Trap could be found as infringing under the doctrine of equivalents.

When literal infringement is not present, infringement under the doctrine of equivalents may be found where the "accused product contain[s] each limitation of the claim or its equivalent." *Eagle Comtronics, Inc. v. Arrow Comm. Labs., Inc.*, 305 F.3d 1303, 1315 (Fed. Cir. 2002) (citing *Warner-Jenkinson Co*, 520 U.S. at 40). "An element in the accused product is equivalent to a claim limitation if the differences between the two are 'insubstantial' to one of ordinary skill in the art." *Id.* (citation omitted). "Relevant to the insubstantial differences inquiry is whether the missing element in the accused device 'performs substantially the same function in substantially the same way to obtain the same result' as the claim limitation." *Id.* (citing *Graver Tank & Mfg. Co.*, 339 U.S. 605, 608 (1950)). "Consideration must be given to the purpose for which an ingredient is used in a patent, the qualities it has when combined with the other ingredients, and the function which it is intended to perform." *Graver Tank*, 339 U.S. at 609.

The Supreme Court identified two possible approaches to analyze whether there is equivalence: the "insubstantial differences" approach and the "triple identity test." *Warner-Jenkinson Co.*, 520 U.S. at 17. The "insubstantial differences" test looks to whether the element asserted to be an equivalent in the accused device is insubstantially different from the claimed element. *Id.* at 39–40. The "triple identity test" focuses on: (1) the function served by a particular claim element; (2) the way that element serves that function; and (3) the result thus obtained by that element. *Id.* The "essential inquiry" under either test is whether the "accused product . . . contain[s] elements identical or equivalent to each claimed element of the patented invention." *Id.* at 40.

12

No matter which test is applied, the court finds that Bee Warehouse Trap does not contain elements identical or equivalent to each claimed element of the '421 Patent. The bottom of the trap entrance unit together with the clear plastic lip does not "perform[ ] substantially the same function in substantially the same way" as the receptacle adapter described in the '421 Patent. *Eagle Comtronics*, 305 F.3d at 1315 (citing *Graver Tank*, 339 U.S. at 608). Nor do the Philips-head screws.

Again, the parties agree that a "receptacle adapter" must include: (1) a structure; (2) located at the exit opening of the trap entrance unit; (3) configured to receive at least one receptacle; (4) configured to help retain a receptacle; and (5) that allows at least some ambient light to enter the interior of the trap entrance unit via the exit opening. (Doc. 24, pp. 13–14). But neither of the alleged receptacle adapters are located at the exit opening of the trap entrance unit. Neither receive at least one receptacle. And neither allow at least some ambient light to enter the interior of the trap entrance unit via the exit opening.

So the court concludes that there is a substantial likelihood that a jury would find that the Bee Warehouse Trap does not infringe the '421 Patent under the doctrine of equivalents.

**2. Substantial Threat of Irreparable Injury**

Next, Bee Warehouse must show that it's likely to suffer irreparable harm absent preliminary relief. *Keister*, 879 F.3d at 1287 (citation omitted).

"A showing of irreparable injury is the sine qua non of injunctive relief." *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000) (en banc) (quotation omitted). A showing of irreparable injury must be "neither remote nor speculative, but actual and imminent." *Ne. Fla. Chapter of the Ass'n of Gen. Contractors v. City of Jacksonville*, 896 F.2d 1283, 1285 (11th Cir. 1990) (quotation omitted). "An injury is 'irreparable' only if it cannot be undone through monetary remedies." *Id.* As with all prerequisites to a preliminary injunction standard, the movant must "clearly carr[y] its burden of persuasion" on irreparable harm. *Suntrust Bank v. Houghton Mifflin Co.*, 252 F.3d 1165, 1166 (11th Cir. 2001) (per curiam).

13

"[T]he temporary loss of income, ultimately to be recovered, does not usually constitute irreparable injury." *Sampson v. Murray*, 415 U.S. 61, 90 (1974). But while economic loss, on its own, does not justify a preliminary injunction, "the loss of customers and goodwill is an irreparable injury." *BellSouth Telecomms, Inc.*, 425 F.3d at 970 (quoting *Ferrero v. Associated Materials, Inc.*, 923 F.2d 1441, 1449 (11th Cir. 1991).

The loss of one's market position is also evidence of irreparable harm. *See Abbott Lab'y v. Sandoz, Inc.*, 544 F.3d 1341, 1361–62 (Fed. Cir. 2008) (loss of market share and revenue are evidence of irreparable harm); *Purdue Pharma L.P. v. Boehringer Ingelheim GMBH*, 237 F.3d 1359, 1368 (Fed. Cir. 2001) (likelihood of price erosion and loss of market position are evidence of irreparable harm); *Polymer Techs., Inc. v. Bridwell*, 103 F.3d 970, 975–76 (Fed. Cir. 1996) (loss of market opportunities cannot be quantified or adequately compensated, and is evidence of irreparable harm); *see also Bio-Tech. Gen. Corp. v. Genentech, Inc.*, 80 F.3d 1553, 1566 (Fed. Cir. 1996) (loss of revenue, goodwill, and research and development constitute irreparable harm).

Bee Warehouse argues that Blazer's actions will cost it revenue and loss of market position on Amazon. Its relationship with Amazon is valuable, and requires significant effort to maintain. Blazer's complaint resulted in the removal of the Bee Warehouse Trap from Amazon, and could lead to the loss of Bee Warehouse's account. Bee Warehouse explains that the season for selling carpenter bee traps is very short (February to May), and keeping its product off the market for even a few months will damage its chances of having a profitable season.

Blazer responds that Bee Warehouse cannot show irreparable harm because it can simply appeal to Amazon. Amazon invites sellers to "explain to us why you were warned in error so that we can investigate the case." And according to Blazer, Bee Warehouse has either (1) failed to take this step, and therefore failed to exhaust other avenues of relief, or (2) unsuccessfully taken this step, as Amazon must have investigated and sided with Blazer. Blazer also argues that Bee Warehouse is selling thousands of bee traps all over the country through retail outlets such as

Home Depot and Lowe's and thus cannot be irreparably harmed by being unable to sell through one specific outlet, Amazon.

The court finds Bee Warehouse's arguments more persuasive.

To begin, Blazer cites no authority suggesting that Bee Warehouse must first exhaust its remedies with Amazon. And nothing in the record shows or suggests that Amazon has made any official determination of whether the Bee Warehouse Trap actually infringes the '421 Patent. Following a prior lawsuit, Amazon gave Blazer an expedited process that allows Blazer to report and remove allegedly infringing items from Amazon. So under those terms, Blazer filed a notice of infringement, and Amazon removed the Bee Warehouse Trap. Now the parties are in court to resolve whether the Bee Warehouse Trap actually infringes Blazer's patent. Nothing suggests that Amazon has already weighed in on the issue. And even if it had, it is unclear why Amazon's determination would be binding or even persuasive to this court. So the court rejects Blazer's argument that Bee Warehouse has suffered no harm because it can seek relief directly from Amazon.

Bee Warehouse has lost revenue as well as its market position on Amazon. And as the Federal Circuit explained, this type of harm is difficult—if not impossible—to quantify and compensate. *See Polymer Techs., Inc. v. Bridwell*, 103 F.3d 970, 975–76 (Fed. Cir. 1996). So the court concludes that, absent injunctive relief, Bee Warehouse will experience irreparable harm.

### 3. Balance of Hardships

The next question is whether Bee Warehouse's possible injury outweighs the potential harm to Blazer if the Bee Warehouse Trap returns to Amazon. *Siegel*, 234 F.3d at 1176. Blazer did not offer any briefing on this issue, but the court will assume that Blazer did not concede it.

When considering the balance of hardships, courts "must weigh the harm to the moving party if the injunction is not granted against the harm to the non-moving party if the injunction is granted." *Id.* (citing *Hybritech Inc. v. Abbott Labs.*, 849 F.2d 1446, 1457 (Fed. Cir. 1988)).

Again, if the court does not issue the injunction, Bee Warehouse cannot sell its trap on Amazon, and could eventually lose all selling rights on the platform. Moreover, Bee Warehouse says that the season for selling carpenter bee traps is short, running from February to May. Without injunctive relief, Bee Warehouse will miss out on this peak selling season. While Bee Warehouse can still sell the trap in various brick-and-mortar stores, the court understands that Amazon is an important marketplace for Bee Warehouse. Taking Amazon away thus imposes a severe hardship.

On the flip side, if the court grants the requested relief, Blazer will have to compete with an allegedly infringing product. As explained above, this court believes that Blazer is unlikely to succeed on the merits of his claim. But of course, Blazer is entitled to litigate his claim on the merits. Requiring Blazer to compete against his own patented invention would place a substantial hardship on Blazer. *See Robert Bosch LLC v. Pylon Mfg. Corp.*, 659 F.3d 1142, 1156 (Fed. Cir. 2011). But the court finds that factual scenario to be unlikely.

Accordingly, the court finds that threatened injury to Bee Warehouse outweighs any potential harm to Blazer.

### 4. Public Interest

Finally, the court must determine whether the requested injunction is in the public's interest. *Siegel*, 234 F.3d at 1176. Once again, Blazer did not brief this issue, but the court will assume he did not concede it.

There is a well-established public interest in "enforcing patents that are likely valid and infringed." *Abbott Labs v. Andrx Pharms., Inc.*, 452 F.3d 1331, 1348 (Fed. Cir. 2006); *see also Apple Inc. v. Samsung Electronics Co., Ltd.*, 735 F.3d 1352, 1372 (Fed. Cir. 2013) (recognizing a public interest in patent enforcement). "However, the public's interest in enforcing patent rights must also be weighed with other aspects of the public interest." *Apple Inc.*, 735 F.3d at 1372.

As Bee Warehouse points out, the public also has an interest in legitimate competition and product choices. *See Abbott Labs. v. Sandoz, Inc.*, 544 F.3d 1341, 1362–63 (Fed. Cir. 2008) (affirming district court's analysis which recognized a public interest in competition). According to

16

Bee Warehouse, "until Blazer proves patent infringement in a court of law, the public is best served by open competition." (*Id.*).

The court acknowledges that there a strong public interest in enforcing patent rights. Indeed, patents would be of little value of infringers could not be notified of the consequences of infringement. *See Virtue v. Creamery Package Mfg. Co.*, 227 U.S. 8, 37–38 (1913). But there is no right to enforce patent rights against a product that clearly does not infringe. The public generally has a right to open and fair competition in the marketplace. The public suffers when consumers are deprived of their choice of product. Because the court has found it likely that a jury would vote against infringement, the court finds that a preliminary injunction would serve the public interest, not harm it.

---

The court finds that Bee Warehouse has met its burden with respect to each of the four preliminary injunction factors. In most cases, the opinion would end here, and the court would grant relief. But because Bee Warehouse asks the court to restrict some speech, and force some speech, the court also must also analyze whether Blazer acted in bad faith.

**B.   Bad Faith**

Bee Warehouse asks the court to enter an order that (1) prohibits Blazer from claiming that the Bee Warehouse Trap infringes his patent, and (2) orders Blazer to retract any past claims of infringement. (*See* Doc. 3). The Federal Circuit has "note[d] the rarity of an injunction being granted against communicating with others concerning one's patent rights." *GP Indus. Inc. v. Eran Indus., Inc.*, 500 F.3d 1369, 1373–74 (Fed. Cir. 2007). A patentholder generally has "a right to inform others of his . . . patent rights," and "[t]hus, an injunction against communication is strong medicine that must be used with care and only in exceptional circumstances." *Id.* at 1374.

Federal law "requires a showing of bad faith" before a party can be barred from communicating about his patent rights. *Mikohn Gaming Corp. v. Acres Gaming, Inc.*, 165 F.3d 891, 899 (Fed. Cir. 1998). Bad faith in this context has both an objective and subjective component. *Id.* at 897.

17

"Although bad faith in this context has both objective and subjective elements, the former is a threshold requirement." *Lite-Netics, LLC v. Nu Tsai Cap. LLC*, 60 F.4th 1335, 1343 (Fed. Cir. 2023) (citing *Judkins v. HT Window Fashion Corp.*, 529 F.3d 1334, 1338 (Fed. Cir. 2008)). So the court will begin its analysis with the "objective" requirement.

### 1. Objective Bad Faith

To establish objective bad faith, "[a] plaintiff claiming that a patent holder has engaged in wrongful conduct by asserting claims of patent infringement must establish that the claims of infringement were objectively baseless." *Globetrotter Software, Inc. v. Elan Computer Group, Inc.*, 362 F.3d 1367, 1377 (Fed. Cir. 2004). An infringement allegation is objectively baseless if "'no reasonable litigant could realistically expect success on the merits.'" *Lite Netics, LLC*, 60 F.4th at 1343 (quoting *GP Indus. v. Eran Indus., Inc.*, 500 F.3d 1369, 1374 (Fed. Cir. 2007)).

"An incorrect allegation of patent infringement is not necessarily objectively baseless." *Id.* at 1344. "Indeed, a patentee, acting in good faith on its belief as to the nature and scope of its rights, is fully permitted to press those rights 'even though he may misconceive what those rights are." *Id.* at 1344 (quoting *Mikohn Gaming Corp. v. Acres Gaming, Inc.*, 165 F.3d 891, 897 (Fed. Cir. 1998)).

The court finds that Blazer's infringement allegation was not objectively baseless.

On February 4, 2022, Blazer represented in another case before this court that the Bee Warehouse Trap did ***not*** infringe his '421 Patent. (*See* Case No. 1:19-cv-838-CLM, Doc. 117, p. 38). (*See also* Doc. 24, pp. 75, 81–82). But Blazer made that representation in the light of "[this] Court's construction of the disputed terms . . . "which [was at that time] the law of this case." (*See* Case No. 1:19-cv-838-CLM, Doc. 117, p. 38). In the very next sentence, Blazer reserved the right to appeal this court's claim construction order to the Federal Circuit, and assert claims for infringement of the '421 Patent after the appeal. (*Id.*).

On November 16, 2022, the Federal Circuit issued its opinion on the definition of "receptacle adapter." The Federal Circuit announced a new

18

definition—one that differed from the one this court entered in one relevant respect: this court said that the receptacle adapter was a part of the trap entrance unit; the Federal Circuit did not. After reading the Federal Circuit's opinion, Blazer and his counsel determined that the Bee Warehouse Trap ***did*** infringe the '421 Patent, under the new definition of "receptacle adapter." (*See* Doc. 24, p. 99).

So while Bee Warehouse correctly pointed out that Blazer changed his position about whether the Bee Warehouse Trap infringed the '421 Patent, the court—having heard counsel question Blazer and having personally questioned Blazer—concludes that Blazer's change of position was reasonable, and does not indicate bad faith. This finding alone is enough for the court to conclude that Blazer's claim of infringement was not objectively baseless. And other evidence reinforces this finding.

For example, the record shows that Blazer knew he would face financial penalties for making a false claim of patent infringement. (Doc. 24, pp. 27–28). Blazer explained that Amazon offers a "neutral evaluation" process. If a seller claims patent infringement, each side pays $3,000, and then a neutral evaluator outside of Amazon evaluates the patent or claims. Whoever prevails gets his $3,000 back. The person who falsely claimed patent infringement (or infringed a patent) loses his $3,000. To be sure, Blazer's last experience with this program occurred in 2020, and Blazer admitted during cross-examination that he does not know if Amazon still operates this way. But the court finds that Blazer honestly believed he would face financial consequences for making improper claims of infringement to Amazon. And that further supports the finding that Blazer did not act in bad faith.

The record also shows that Blazer sought advice from his lawyer before making claims of infringement. (*See, e.g.*, Doc. 24, p. 26). Blazer testified that "[i]f [my lawyer] says it doesn't infringe, it doesn't infringe," and "if my lawyer says it doesn't infringe, we don't present [an infringement claim] to Amazon." (Doc. 24, p. 94). Blazer followed counsel's advice when he took the position in another lawsuit that the Bee Warehouse Trap did not infringe his patent. Blazer's testimony persuades the court that he relied on the advice of counsel when changing that

position. And that reinforces the court's finding that Blazer's allegations of infringement to Amazon were not objectively baseless.

For the reasons explained above, the court concludes that Blazer did not act with objective bad faith.

### 2. Subjective Bad Faith

Because the court finds no objective bad faith, the court need not opine on whether Blazer acted with subjective bad faith. *See Lite-Netics, LLC*, 60 F.4th at 1344 ("Subjective bad faith must be addressed if allegations are determined to be objectively baseless, but not otherwise.").

———

Again, the court finds that Bee Warehouse met its burden on all four preliminary injunction factors. But Bee Warehouse did not prove that Blazer acted in bad faith, so the court cannot grant the requested relief.

## CONCLUSION

The court **DENIES** the motion for a preliminary injunction (doc. 3) for these reasons explained above.

**DONE** and **ORDERED** on May 3, 2023.

*/s/ Corey L. Maze*
**COREY L. MAZE**
UNITED STATES DISTRICT JUDGE